# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

DERRIS SMITH,

:

    Petitioner,                                      Case No. Case No. 1:10-cv-852

:         Chief Judge Susan J. Dlott

  -vs-                                               Magistrate Judge Michael R. Merz

TIMOTHY BRUNSMAN, Warden,
Lebanon Correctional Institution,

:

    Respondent.

## REPORT AND RECOMMENDATIONS

This habeas corpus action under 28 U.S.C. § 2254 was brought on behalf of Petitioner Derris Smith by his father, Dorvis Sweeten.

Mr. Sweeten explains that he has all the necessary documents, the process is complicated, his son did not understand the necessary paperwork, and there was only a short period of time in which to file (Petition, Doc. No. 1, PageID 15; Reply, Doc. No. 8, PageID 1698). Respondent notes that the documents have been filed by a next friend and raises no objection (Return of Writ, Doc. No. 7, PageID 57, n.2). The Court concludes that Mr. Sweeten fulfills the necessary requirements to act as a next friend in this case, particularly in light of the Petitioner's apparent youth. See Hertz & Liebman, Federal Habeas Corpus Practice and Procedure 6th § 8.3.

The Petition itself includes three Grounds for Relief and then has attachments which are taken from other documents, some typed and some handwritten, which have had grounds for relief labels placed on them. Respondent re-states the Grounds for Relief as follows:

**GROUND ONE**: Ineffective assistance of counsel.

**Supporting Facts:** My son's lawyer did not have an expert medical doctor to prove his innocence. To explain why mother would lie. We had no doctor to investigate. Could not afford one.

**GROUND TWO:** Post-mortem report.

**Supporting Facts:** Post-mortem report shows no skull fracture no bruises There was no impact injury There's a medical document that says no open intracranial wound, an open intracranial wound – inside the brain injury occurs when an outside force penetrates the brain cavity. If there was a beaten such as slammed against wall and door (why no outside proof)

**GROUND THREE:** Dr. Jennifer Kaplan's report, a document I found, I went to library trying to find out more about it

**Supporting Facts:** It states other death performed no autopsy coroner's case. It has MDC code 021 injuries, poisoning and toxic effect of drugs. This paper was never presented to us. If so I would have done some research on my own.

**GROUND FOUR:** Death certificate's immediate cause of death and manner of death

**Supporting Facts:** The immediate cause was - (A) Intracranial hemorrhage (there was no open intracranial wound) from (B) craniocerebral trauma. The manner of death codes were 852.2 = injury and poisoning – 959.01 = injury and poisoning 432.9 = disease of circulatory system. Trauma could have been from poisoning and toxic effects of drugs which caused intracranial hemorrhage. Have paper that states MDC code 021 = infectious disease, with secondary diagnosis with other diseases.

**GROUND FIVE:** Lt. Heibling a Cincinnati firefighter testified that he observed no evidence of physical damages as factures, cuts or blood Firefighter Tracy testified that he believed that a fall down steps could create such a head injury (but he's no medical expert) Firefighter Tracy testified that he did not observe any blood nor any other indications that the child had been repeatedly bumped into a wall.
Dr. Katherine Makoroff said there were no skull fractures. Dr. Makoroff testified that mother told her that the baby fell down the

steps three times within previous two months. Doctor testified that she saw no old injury, but could not rule out a head injury altogether from prior falls. Doctor testified that the injury sustained by baby was not consistent with a fall down the steps, but could be consistent with "shaken baby syndrome" The doctor could not rule out that the mother caused this injury.

Mother testified that Derris did not shake the baby.

Dr. Michael Kenny, the coroner that the baby's internal exam was very normal except for swelling and edema. Medical expert M.D. Spitz stated edema, i.e. swelling was from a period of cardiac arrest. The physician's report – the attending physician Dr. Katherine Makoroff stated that the baby's injuries were not consistent with falling down steps.

Mother later said Derris hit the baby's head against the wall. Doctor Makoroff stated if this occurred repetitively, this history could help account for the injuries sustained. However on exam and head ct there was not evidence of soft tissue, swelling of the scalp and no skull fracture which you would expect to see with sever contact as to hitting the wall.

The prosecutor stated that there was nothing to discredit what medical doctor's testified about the baby's injuries and how they occurred. But all of the doctor's statements and testimonies discredit what's being said about a beaten against a wall and a door.

**GROUND SIX:** The Prosecutor was not going to have a medical expert to testify about poisoning and toxic effects of drugs. I believe if we had funds for a medical expert they could have determined if injuries could have been from overdose of Tylenol which mother stated the baby was sick for days and she gave him Tylenol four times a day. She said he had cold symptoms, fever, sneezing coughing she should have taken him to hospital, she also said he was having staring spells. Which could account for mother lieing about a beaten which is inconsistent. That also can account for police coercion with mother. If you tell someone they have two options now she's ready to lie fearing she may get in trouble.

**GROUND SEVEN:** [There is no original written argument. Smith has included a portion of his brief before the state appellate court with large parentheses emphasizing his assignment error concerning the sufficiency and the manifest weight of the evidence regarding the murder conviction]

**GROUND EIGHT:** [There is no original written argument. Smith has included a letter written by Dr. Werner Spitz, a forensic

pathologist, to Assistant Public Defender Sarah Schregardus, in which he disagrees with the medical evidence presented at trial which had concluded that the victim died from an impact to his head]

**GROUND NINE:** [This argument includes a portion of a medical report for the victim, which includes a primary and a secondary diagnosis. Following this excerpt are some notes and observations by Smith, citing codes from the International Statistical Classification of Diseases and
Related Health Problems, although it is unclear what point he is trying to make. He then writes: "If injuries had resulted from a significant force, how could the injuries not be consistent with a fall down the steps. There was no open intracranial wound. An open intracranial wound inside the brain injury occurs when outside. Could the abdominal bruises be consistent with CPR which Derris was giving baby. Mother testified the baby was not shakened"]

**GROUND TEN:** [The argument points out that Rodrick Glenn, Sasha Glenn's brother had seen Smith sitting by the victim, which is inconsistent with Sasha's version of events. Smith also notes that Dr. Makoroff stated that the injuries were consistent with shaken baby syndrome, although Sasha Glenn stated the baby was not shaken. Smith then argues that the death of the victim was not from being beaten but from an overdose of Tylenol and ibuprofen]

(Return of Writ, Doc. No. 7, PageID 57-59.) In the Reply, Petitioner does not disagree with this restatement of his arguments.

The Court of Appeals of Hamilton County summarized the evidence on direct appeal as follows:

[*P1] Defendant-appellant Derris "D.J." Smith appeals his convictions for felony murder, felonious assault, and child endangering, resulting from the fatal injuries that he inflicted on 18-month-old Malakai Glenn ("Malakai"). We affirm.

[*P2] On June 27, 2007, at about noon, the Cincinnati Police and Fire Communications Department received a 911 call from Sasha Glenn ("Glenn") originating from the apartment that Glenn shared with Smith, her boyfriend; Roderick Glenn, her brother; and Malakai, her toddler son. Glenn reported that Malakai was having difficulty breathing. When emergency personnel arrived at Glenn's apartment,

Smith directed them upstairs to a front bedroom where Malakai was lying on the bed. Malakai, barely breathing, exhibited a blank stare and was unresponsive. He soon stopped breathing. Although emergency personnel first believed that Malakai had suffered a seizure, they soon realized that he had not suffered a seizure but instead had a severe head injury. Glenn told them that Malakai had fallen down the steps.

 [*P3] Emergency personnel observed that Smith appeared "jittery" and "nervous"; Glenn seemed "abnormally aloof" and "afraid." At the time, the 20-year-old Glenn was eight months' pregnant with Smith's child. Glenn's brother Roderick was not home when the injuries had occurred, but he returned home after the paramedics arrived.

 [*P4] Because Malakai had stopped breathing, the paramedics rushed him to Children's Hospital. The medical exam indicated that Malakai had suffered severe head trauma that was consistent with child abuse but not consistent with a fall down the steps. Malakai was later determined to be brain-dead. The family members gave doctors permission to remove him from life support. He died on July 1, 2007.

 [*P5] Although Glenn had initially blamed Malakai's injuries on a fall down the steps, she eventually told the police and others that Smith had become angry with Malakai and had grabbed him by his Spiderman pajama top and had slammed his head against the hard surfaces of the wall and closet door of her apartment. The detective investigating Malakai's injuries found a small black hair and an oily mark where Glenn claimed Malakai's head had struck the wall. He also found a substantial crack in the closet door.

 [*P6] Smith, a juvenile, was bound over to a Hamilton County grand jury and indicted on one count of aggravated murder; two counts of felony murder, one with the predicate offense of felonious assault and the second with a predicate offense of child endangering; one count of felonious assault; and one count of child endangering.

**The Trial**

 [*P7] At Smith's trial, Glenn testified that in the late morning on June 27, while in the front bedroom located on the second floor of the apartment, she and Smith had argued over a "potty" incident involving Malakai. Specifically, Smith had wanted to punish Malakai, because instead of using the training potty that he had been placed upon, he had retrieved a pillow and a stool to rest on and had

fallen asleep while sitting on the potty. Glenn testified that after they argued she had gone downstairs and that, when she returned upstairs, she saw Smith "whooping" on Malakai with his hands in the rear bedroom. She told Glenn to stop, and when Malakai came to her, she noticed that Malakai had "white stuff "in his hair. Glenn wiped Malakai's head clean, and Malakai followed her into the front bedroom. Smith entered the room and insisted that the punishment continue. This time, however, he picked up Malakai by his Spiderman pajama top and slammed his head against a hard surface twice--first against a wall and then against the heavy closet door, leaving a crack in the door. Malakai never cried, kicked, or flailed.

[*P8] After the blows, Smith threw Malakai on the bed. Glenn picked him up and called his name, but he was unresponsive. Smith decided to put him in the shower, and when the water failed to rouse Malakai, Smith told Glenn to call 911 and to tell the dispatcher that Malakai had fallen down the stairs.

[*P9] Glenn further testified that she had been interviewed by the police several times on the day of Malakai's abuse and that some of her statements were not consistent with her trial testimony. Glenn explained that she had first blamed Malakai's injuries on a fall down the stairs because Smith had told her to do so and because she had been "shocked" and "scared."

[*P10] Glenn identified her voice on the recording of the 911 call that she had placed after she had found Malakai unresponsive. On this tape, which was admitted into evidence, an out-of-control Smith can be heard coaching Glenn to say that Malakai had fallen down the steps and warning Glenn about the "police." The medical call taker advised Glenn to calm Smith down or to have him leave the room because of his ranting and raving. Smith can be heard in the background apologizing to Malakai near the end of the recorded call.

[*P11] On direct examination, Glenn was asked why she did not stop Smith as he harmed Malakai. She replied that she was "just shocked." The prosecutor followed up with a question about whether Smith had ever struck her before, and she responded that he had hit her sometimes when they argued. She testified also that they had argued the day before the incident because Smith was angry that the apartment was dirty.

[*P12] Glenn's neighbor Clifford Barnes testified that he had overheard an altercation in Glenn's apartment in the early morning

hours of the day that Malakai was rushed to the hospital. He claimed to have heard banging on walls, a baby crying, and "him" threatening to kill Glenn and slapping her many times. On cross-examination, Barnes testified that Smith smoked hashish and came around him "high" everyday, and that he had often heard Smith threatening and slapping Glenn in the apartment.

[*P13] Dr. Kathi Makoroff, a member of the Children Hospital's child-abuse team, testified about Malakai's injuries and his treatment for those injuries at Children's Hospital. Malakai was essentially in a coma. A CAT scan of his head showed that he was bleeding around his brain and that the right side of his brain had shifted seven to eight millimeters to the left. Malakai suffered massive retinal hemorrhaging in both eyes.

[*P14] Malakai underwent emergency surgery to drain the blood from his cranial cavity and to remove a part of his skull to allow room for his herniating brain. The neurosurgeon discovered, upon opening his skull, that the brain itself was very swollen. The operation had to be stopped, and attempts to reduce the brain swelling failed. Malakai was determined to be brain-dead and was removed from life support several days later.

[*P15] Makoroff testified that, based upon his injuries, Malakai would have been rendered unconscious and unresponsive immediately after the fatal blow to the head. Makoroff opined that Malakai's severe head injuries were not consistent with a mere fall down the stairs or a child intentionally hitting his head against a hard surface, but that they were consistent with child abuse. She also noted that Malakai had an abrasion on the front of his neck that could have been caused by the hem of a T-shirt that had been pulled too tightly to hold up a toddler who had then been flung against the wall.

[*P16] The coroner testified that the cause of death was intracranial hemorrhage due to cranial cerebral trauma. He added that a significant amount of force was necessary, equivalent to that generated in an automobile collision, to cause the trauma that he had observed. He unequivocally opined that Malakai's injuries were not consistent with a fall down the steps and could not have been caused by just shaking him, although he admitted that Malakai did not have a fractured skull. He identified an autopsy photograph that showed Malakai's short, dark hair.

[*P17] Glenn's brother Roderick testified that he had spent the night

in the second bedroom on the evening of June 26, 2007, and that he had seen Malakai in the morning on June 27 before he left for a short time to visit a friend. He said that Malakai was playful but that he was sick, and that he had been sick for several days. Roderick said that when he returned to the apartment, the paramedics were there. Smith, who was "hugging on" Glenn, told him that Malakai had fallen down the steps. Glenn had said nothing.

 [*P18]  Roderick claimed that Smith and Glenn had argued in the early evening of June 26, 2007, but that he had not heard any argument during the night. He also testified that he had never seen Smith or Glenn harm the child, and that, to his knowledge, Smith had never harmed or threatened Glenn.

 [*P19]  Cincinnati Police Detective Michelle Longworth and her partner, Jeffrey Smallwood, investigated Malakai's injuries after the police had learned from the medical staff at Children's Hospital that Malakai's injuries were not consistent with the history provided by the mother. Longworth interviewed Glenn three times on the day the 911 call was placed.

 [*P20]  Longworth first interviewed Glenn at the hospital within a few hours after the 911 call. Glenn began the interview by telling Longworth that her son had fallen down the steps twice in the past two months but had not required medical treatment. Also, Glenn told her that he had had a cold for several days and had had a habit of banging his head on walls and tables.

 [*P21]  In this first interview, Glenn had blamed Malakai's injuries on a fall down the stairs. Specifically, she said that she had heard a loud boom while in her bedroom with Smith. Smith ran out of the bedroom and down to the bottom of the stairs, where he found Malakai. She joined Smith, and they discovered that Malakai was unresponsive. Smith told her that Malakai had been reaching for a toy when he fell, although, as Longworth pointed out to Glenn, Smith could not have seen this from where he was sitting in the bedroom.

 [*P22]  In her second interview, which began at 5:23 p.m. at the hospital, Glenn again insisted that Malakai had fallen down the steps. But about halfway through the interview, she began crying and stated that "D.J. get mad." She then described how Smith had punished Malakai for retrieving a stool to rest his head on while he sat on a toilet-training "potty," first by "whoppin' on him"--spanking his bottom-and then by picking him up by his shirt and striking his head

against the wall two times, once in each bedroom, and then against the door in the front bedroom.

[*P23] Glenn's third interview began at 6:39 p.m. She was asked about several holes that a criminalist had seen in the apartment's walls. She said that none of the holes were related to Malakai's abuse, and that while Smith had hit Malakai other times in the past, he had never before slammed his head against hard surfaces.

[*P24] All three of Glenn's recorded interviews were admitted into evidence at trial without objection.

[*P25] Criminalist Spencer Henderson testified that he had gone to Glenn's apartment about an hour after the 911 call was received to collect evidence concerning an injury to a baby. He had photographed the scene, and these photographs were entered into evidence. The photographs did not depict any toy on the steps or at the bottom of the stairs, but there was a small toy in a pile of shoes and clothes in a corner at the top of the stairs. One photograph depicted a training potty, a pillow, and a child's stool grouped together in the front bedroom. Others depicted holes and indentations in the walls and doors of the apartment, including three-and-one-half-inch intersecting cracks in the heavy closet door of Glenn's bedroom, about five feet and two inches from the floor. Another photograph depicted a damp child's Spiderman pajama top that was located in the front bedroom.

[*P26] Henderson returned to the apartment two more times after June 27, 2007. The third time, which happened a week after the incident, he was accompanied by Glenn. Glenn showed him where Malakai's head had hit the wall in the first bedroom. Henderson directed his attention to that area and located a small black hair that was stuck to the wall between two small faint grease spots about eight inches from the floor. He removed the hair and preserved it as evidence but did not test to see to whom it belonged. Henderson also observed that the wall in that location consisted of a solid support beam and was not just drywall. The wall was not indented. Glenn also showed Henderson where Malakai's head had hit the closet door, leaving a substantial crack. Henderson removed the door, and it was admitted into evidence.

[*P27] In his defense, Smith presented the testimony of Kelly Glenn, the wife of Sasha Glenn's father. Kelly Glenn testified that Glenn and Malakai had resided with her from his birth through

> November 2006; that Smith had treated Malakai well when he was
> around them; and that she had concerns about Malakai's safety when
> he was around Glenn.

*State v. Smith*, 2009 Ohio 3727, 2009 Ohio App. LEXIS 3200 (1st Dist. July 31, 2009).

**Procedural Default**

Respondent asserts Petitioner's First Ground for Relief is procedurally defaulted because based on a different theory of ineffective assistance of trial counsel than was presented to the state courts. (Return of Writ, Doc. No. 7, PageID 63-64.) He asserts Grounds Two, Three, Four, Five, Seven, Nine and Ten are defaulted because Petitioner's insufficiency and manifest weight of the evidence claims were never presented to the Ohio Supreme Court and some are argued on a different theory in the Petition than they were argued in the state courts. *Id.* PageID 64-71. Grounds Six and Eight on the possibility of Tylenol poisoning or shaken baby syndrome as the cause of death were never presented to the state courts and are therefore procedurally defaulted. *Id.* PageID 69-71.

In responding to the procedural default defense, Mr. Sweeten recites the family's efforts with various lawyers and their conclusions about the merits of the case (Reply, PageID 1699-1700). He also notes that the Ohio Public Defender obtained the report from Dr. Werner Spitz with public funds, but the family had not money to obtain a doctor's report prior to trial. *Id.* at 1701.

The procedural default defense in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his
> federal claims in state court pursuant to an adequate

> and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). *Wainwright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainwright v. Sykes*, 433 U. S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985). Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

Respondent is correct that Petitioner's claims about the sufficiency and weight of the evidence, although presented to the court of appeals, were not among the claims presented to the Ohio Supreme Court. Therefore those claims, made in Grounds for Relief Two, Three, Four, Five, Seven, Nine and Ten are procedurally defaulted and must be dismissed with prejudice. Grounds Six

-11-

and Eight, which were never presented to the state courts, are procedurally defaulted on the same basis. Finally Ground One is procedurally defaulted because Petitioner himself withdrew his application for post-conviction relief, regardless of what claims of ineffective assistance of trial counsel he made in it.

## Merits Analysis

Even though the Grounds for Relief are procedurally defaulted, the Magistrate Judge believes some additional explanation on the merits is warranted.

The Petition and Reply in this case are devoted to arguing the weight of the evidence and of omitted evidence which could have been presented. Questions of the weight of the evidence cannot properly be considered on the merits by a federal habeas court because they are not questions which implicate the United States Constitution.

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. §2254(a); *Wilson v. Corcoran,* 562 U.S. ___, 131 S. Ct. 13; 178 L. Ed. 2d 276 (2010)*;Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982), *Barclay v. Florida,* 463 U.S. 939 (1983). "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62 (1991).

In *State v. Thompkins,* 78 Ohio St. 3d 380 (1997)*,* the Ohio Supreme Court reaffirmed the important distinction between appellate review for insufficiency of the evidence and review on the

claim that the conviction is against the manifest weight of the evidence. It held:

> In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102, 387 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, *citing Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. *Robinson, supra*, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.)
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a " 'thirteenth juror' " and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs*, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

78 Ohio St. 3d at 387. In *State v. Martin*, 20 Ohio App. 3d 172 (Hamilton Cty. 1983)(cited approvingly by the Supreme Court in *Thompkins*), Judge Robert Black contrasted the manifest weight of the evidence claim:

> In considering the claim that the conviction was against the manifest weight of the evidence, the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

485 N.E. 2d at 718, ¶3 of the syllabus. The consequences of the distinction are important for a criminal defendant. The State may retry a case reversed on the manifest weight of the evidence; retrial of a conviction reversed for insufficiency of the evidence is barred by the Double Jeopardy Clause. *Tibbs v. Florida*, 457 U.S. 31(1982).

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir. 1990)(en banc). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319. Upon review of the factual findings of the Hamilton County Court of Appeals set forth above, there can be no doubt that there was sufficient evidence to convict. Malakai's mother testified what she saw Petitioner do to her son, behavior which was consistent with the medical testimony about the cause of death. Mr. Sweeten's argument that her testimony

was "coerced" by police was not believed by the jury to the extent it was made on cross-examination.

Virtually all of Mr. Sweeten's argument on his son's behalf is about the weight of the evidence, an issue this Court cannot consider. As to the omitted evidence, this Court cannot conclude that Petitioner did not get a fair trial or received ineffective assistance of counsel because that evidence was not presented. Even the State Public Defender felt compelled to recommend withdrawal of the post-conviction petition because Dr. Spitz's evidence was consistent with Petitioner's guilt.

## Conclusion

All of Petitioner's claims are subject to dismissal as procedurally defaulted. His claims about the weight of the evidence are not federal constitutional claims. There certainly was sufficient evidence upon which to base a verdict. Therefore the Petition should be dismissed with prejudice. Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and this Court should certify to the Sixth Circuit that any appeal would be objectively frivolous, precluding an appeal *in forma pauperis*.

December 15, 2011.

s/ **Michael R. Merz**
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

J:\Smith, Derris Habeas R&R.wpd